# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NATASHA POLK ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | Civil Action No: |
| v. ) | |
| ) | |
| METROPOLITAN GOVERNMENT OF ) | Judge: |
| NASHVILLE AND DAVIDSON ) | |
| COUNTY, TENNESSEE; ) | Magistrate Judge: |
| ) | |
| And ) | |
| ) | JURY DEMAND |
| ZACHARY ALDRICH, ) | |
| ) | |
| *Defendants*. ) | |

## COMPLAINT

1. Plaintiff brings this action for damages alleging that Defendants violated Plaintiffs' federal constitutional right against false arrest on August 11, 2023. Plaintiff seeks compensation and other just and appropriate relief for this violation of her legal rights.

## PARTIES

2. **Plaintiff Natasha Polk ("Mrs. Polk")** is an adult married resident of Davidson County, Tennessee.

3. **Defendant Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro")** is a governmental entity organized under the laws of the State of Tennessee and located in Davidson County, Tennessee.

1

4. **Defendant Zachary Aldrich ("Officer Aldrich")** is an adult resident of Tennessee, who on information and belief resides in Davidson County, Tennessee.

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because Defendants reside in this district and the events at issue in this lawsuit occurred in this district.

## FACTUAL BACKGROUND

### A. Background

6. Plaintiff Mrs. Polk is a forty-five-year-old mother of five and grandmother of six. Mrs. Polk has been with her husband, Mario Polk, since 1997 and they have been married since 2005. They have raised five children together, all of whom are now grown.

7. Mrs. Polk is employed full-time in the field of medical billing, and is also a notary public. Mr. Polk is self-employed.

8. Mrs. Polk has no felony convictions on her record. When she was much younger, she did have a few misdemeanor convictions. One of those cases, which was initiated in 1999, was initially charged as a felony but was resolved without any felony convictions.

9. Mrs. Polk owns a firearm.

10. In 2016, the state of Tennessee issued a valid handgun carry permit to Mrs. Polk which was set to expire in March 2019.

11. Mrs. Polk's initial carry permit expired in March 2019, and she then obtained a new permit issued in June 2019. The new permit is valid through the year 2027.

12. The state of Tennessee would not have issued handgun carry permits to Mrs. Polk if she had had any felony convictions on her record.

13. As part of the process of obtaining her carry permit, Mrs. Polk obtained and provided documentation to the Tennessee Department of Safety reflecting that the 1999 case was resolved without any felony convictions.

14. Mrs. Polk's Tennessee carry permit has remained valid since its issuance in 2019, with an expiration date in 2027.

### B. August 11, 2023 Automobile Accident

15. On August 11, 2023, Mrs. Polk was in an afternoon automobile accident in Nashville.

16. Law enforcement and emergency medical services responded to the accident.

17. Mrs. Polk was injured in the accident, and was taken by ambulance to the emergency room at Tristar Summit Medical Center.

18. Mrs. Polk had her handgun in her purse when the accident occurred.

19. In the ambulance, Mrs. Polk informed the emergency medical personnel about her handgun and her carry permit.

20. Because hospital policy prohibited the possession of firearms inside the hospital, the Summit security held Mrs. Polk's handgun while she was being treated.

21. Mrs. Polk's husband came to the hospital, and anxiously awaited her discharge.

22. Mrs. Polk was discharged from the hospital later that evening.

23. Mrs. Polk met with her husband in the waiting area, and then told him she needed to stop by security to reclaim her handgun. Mr. Polk headed out to the parking lot to pull the car around to pick his wife up.

24. As she approached the security desk, a Metro Nashville Police Department ("MNPD") officer approached her and told her to step outside.

25. Mr. Polk noticed what was happening to his wife, and stopped to make sure everything was ok.

### C. MNPD Falsely Arrests Mrs. Polk

26. MNPD Officer Zachary Aldrich ("Officer Aldrich") detained Mrs. Polk outside the hospital for over an hour, telling her that he needed to obtain a "paper."

27. Eventually, Officer Aldrich finally explained that he was taking Mrs. Polk into custody for having a handgun, because, according to Aldrich, Mrs. Polk was a felon.

28. Mrs. Polk explained to Officer Aldrich that she is not a felon, and that she had a valid handgun carry permit.

29. Mrs. Polk showed Aldrich her carry permit, issued by the state of Tennessee in 2019.

30. Mrs. Polk's husband also attempted to explain to Aldrich that Mrs. Polk was not a felon.

31. Notwithstanding Mr. and Mrs. Polk's statements and their efforts to show Officer Aldrich Mrs. Polk's Tennessee carry permit, Aldrich arrested Mrs. Polk outside the hospital.

32. Officer Aldrich had Mrs. Polk's name and contact information, and could have easily just deferred the arrest decision to investigate her criminal records further so that he could determine whether she was or was not a felon.

33. If he had done so, he would have easily discovered based on Davidson County's computerized, publicly accessible criminal record keeping system that she is not a felon.[1] If he had any further doubts regarding the accuracy of the Clerk's Office's website, he

---

[1] Available at: https://sci.ccc.nashville.gov/Search/CaseSearchDetails/24518%5E56002%5ECJIS/NATASHA%5EWRIGHT%5E03261979%5E209179/. Note that the 1999 case was charged under Mrs. Polk's maiden name, Wright – however, Aldrich clearly had that information from MNPD records since he was aware of the case in the first place.

could have used his MNPD access to Davidson County's "CJIS" system to confirm that the website is accurate (which it is).

34. Mr. Polk explained to the MNPD officers on the scene that he proof at home that the 1999 case had not resulted in any felony convictions – the same proof that Mrs. Polk had provided to the Tennessee Department of Safety in 2019.

35. Another MNPD officer on the scene quietly advised Mr. Polk to go get the proof and bring it to the night court commissioner.

36. Meanwhile, Officer Aldrich took Mrs. Polk to jail.

### D. The Commissioner Releases Mrs. Polk

37. Officer Aldrich delivered Mrs. Polk to Metro's "Mobile Booking Unit" ("MBU") and into Davidson County Sheriff's Office ("DCSO") custody.

38. MNPD and DCSO policy and procedure require arresting officers to complete and submit an MNPD "Arrest Report" in order to deliver a suspect into DCSO custody.

39. On information and belief, Officer Aldrich completed an MNPD Arrest Report for Mrs. Polk when he delivered her to DCSO.

40. DCSO then transported Mrs. Polk to DCSO's Downtown Detention Center, where she would be incarcerated for the next few hours.

41. Officer Aldrich then drafted a warrant affidavit in an attempt to initiate criminal charges against Mrs. Polk for (allegedly) being a felon in possession of a firearm.

42. The computer used by MNPD officers to draft warrant affidavits at the MBU has access to CJIS, the computer system used by the Davidson County Clerk's Office to track criminal case records.

43. On information and belief, as part of this process Aldrich reviewed Mrs. Polk's Metro Nashville "CJIS" history, which showed that her 1999 case had been resolved without any felony convictions and that she had no other felony convictions.

44. Nonetheless, Officer Aldrich persisted in attempting to have Mrs. Polk charged with a felony, for allegedly being a felon in possession of a firearm.

45. However, in the meantime Mr. Polk rushed home, got the certified copy of the 1999 case judgment, and then rushed to night court.

46. Mr. Polk delivered the certified copy of the judgment to the night court commissioner, who reviewed it along with Mrs. Polk's other computerized criminal records and determined that Mrs. Polk was not a felon.

47. However, Officer Aldrich attempted to convince the commissioner to charge Mrs. Polk with being a felon in possession of a firearm anyway.

48. The commissioner declined, and ordered Mrs. Polk released.

49. Based on the commissioner's order, DCSO then released Mrs. Polk back to Officer Aldrich.

50. By the time DCSO released Mrs. Polk from jail, she had spent approximately three hours locked up there.

51. Upon her release from jail, DCSO gave Mrs. Polk copies of her "Inmate Personal Property Receipt" forms from both Metro's Mobile Booking Unit and from DCSO's Downtown Detention Center, documenting that she had been booked into both facilities.

52. Officer Aldrich brought Mrs. Polk around the corner to her husband.

### E. Metro's Policies, Training, and Practices Caused Defendant Aldrich to Disregard the Exculpatory Evidence Mrs. Polk Attempted to Present

53. Defendant Metro exercises control over the policies, training, and practices of MNPD.

6

Case 3:24-cv-00967    Document 1    Filed 08/08/24    Page 6 of 14 PageID #: 6

54. MNPD's policies are codified in a 1,382 page "Departmental Manual."

55. In all of its 1,382 pages, the MNPD manual uses the word "exculpatory" exactly once. This usage is in connection with MNPD's internal disciplinary procedures for dealing with allegations of officer misconduct, and has nothing to do with the policies governing arrests or the filing of criminal charges against suspects.

56. MNPD's manual does not define the constitutional requirements for an officer to arrest a suspect, i.e. "probable cause," at even a general level – much less mandate that officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

57. MNPD's manual does not define the constitutional requirement for an officer to file criminal charges against a suspect, i.e. "probable cause," at even a general level – much less mandate that officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

58. While MNPD's officer training programs do define the probable cause requirement for an arrest at a general level, they do not teach the constitutional requirement that officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

59. MNPD's officer training programs do not define the constitutional requirement for filing criminal charges against a suspect, *i.e.* probable cause, at even a general level – much less train officers that they must not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

60. MNPD's policy and practice with regard to citizen complaints alleging false arrest is that the complaining citizen should take those complaints to court, not MNPD.

61. If the charges at issue have already been dismissed, MNPD will investigate the false complaint allegation. However, MNPD's *de facto* practice is to give officers the benefit of the doubt in any issues of contested fact between the citizen and the officer, and to not sustain disciplinary charges against officers for false arrests unless tangible, objective evidence, such as an audiovisual recording, proves with absolute certainty that the arrest was illegal. Functionally, this impossibly high standard of proof results in MNPD almost never sustaining citizen complaints of false arrest.

62. In totality, MNPD's policies, training gaps, and failure to discipline for false arrests result in a *de facto* policy of disregard for the constitutional requirement that when making arrest decisions officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

63. It is obvious that that MNPD's *de facto* policy of disregard for the requirement that officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone" will result in cases like Mrs. Polk's, in which MNPD officers make arrests of innocent people who have provided exculpatory evidence that either negated probable cause or at least obligated the officer to investigate further. In Mrs. Polk's case, once she showed Officer Aldrich her Tennessee handgun carry permit he should have deferred the arrest decision to investigate her records further.

### F. Metro Blatantly Disregards Mrs. Polk's Efforts to Hold MNPD Accountable[2]

64. In the wake of her false arrest, Mrs. Polk has made several efforts to obtain justice and impose accountability on MNPD.

65. In August 2023, shortly after her arrest, Mrs. Polk submitted a complaint to the Metro Nashville Community Oversight ("MNCO") agency. However, it would be several months before an MNCO investigator would get in touch with Mrs. Polk.

66. Mrs. Polk retained the undersigned firm as counsel to investigate her false arrest claim, and on October 23, 2023, the firm's paralegal made a Tennessee "Open Records" Act request under T.C.A. § 10-7-503 to MNPD for Mrs. Polk's August 11, 2023 arrest report, incident report, any related body- or dash- camera footage, and any other related reports.

67. Under Tennessee's "Open Records" act, because there were no criminal charges pending as a result of the arrest the bulk of the records are public as a matter of state law.

68. MNPD responded to this firm's records request stating that it would need until June 2024 to fulfill the request, and that MNPD would charge approximately $320 to process it.

69. On October 26, 2023, the undersigned firm's paralegal submitted a request to DCSO for its booking, release, incident report, and property receipt records related to the August 11, 2023 arrest.

70. However, DCSO responded that it had no records of Mrs. Polk's August 2023 arrest.

71. Mrs. Polk and the undersigned firm awaited MNPD's records production for the next several months.

---

[2] Mrs. Polk anticipates filing a separate action in state court for Metro's violation of Tennessee's "Open Records" Act. T.C.A. § 10-7-501 *et seq.* Tennessee state courts have exclusive jurisdiction over such claims, which is why this claim is not presented to this court under its supplemental jurisdiction. However, Mrs. Polk provides these facts pertinent to that claim in this complaint as well, for additional context with regard to Metro policy and practice in forestalling efforts to hold MNPD accountable.

72. In the meantime, an MNCO investigator was finally assigned to Mrs. Polk's case. Although the MNCO investigator has since become a steady source of emotional support for Mrs. Polk, MNCO has not been able to effect any tangible accountability in this matter.

73. In May 2024, Mrs. Polk made several of her own independent records request to MNPD. On May 7, 2024 and again on May 10, 2024, Mrs. Polk emailed records requests to MNPD's Central Records division. Mrs. Polk received an email back from Central Records stating that she needed to complete a form to obtain these records. On May 15, 2024, Mrs. Polk went to MNPD's Central Records office in Madison, Tennessee to submit the form and request her records from the arrest. However, MNPD's Central Records staff informed Mrs. Polk that there were no records of her arrest.

74. Also in May 2024, Mrs. Polk made phone calls to the Davidson County Court Clerk and DCSO requesting records of her arrest. Mrs. Polk was told that there were no records from her arrest.

75. In June 2024, MNPD finally indicated to the undersigned firm that the records requested in October 2023 were available, once payment of $265.33 was made to MNPD. This firm paid the fee, and awaited the records.

76. MNPD then mailed a thumb drive purportedly including the requested records to the undersigned firm. However, upon review there were actually no records on the thumb drive related to Mrs. Polk's arrest – rather, the only records provided were body and dash-camera footage related to the traffic collision that had originally caused Mrs. Polk to be transported to the hospital.

77. The undersigned firm's paralegal then contacted MNPD Central Records to explain that the arrest report and relevant video footage had not been produced, and to (again) request that MNPD produce these records.

78. In response, MNPD's Central Records division emailed the undersigned firm's paralegal claiming that no request had ever been made for Mrs. Polk's arrest-related records – notwithstanding the fact that this assertion was flatly contradicted by the October 2023 records request form.

79. In July 2024, Mrs. Polk was contacted by an investigator with MNPD's "Office of Professional Accountability," who gave her several pieces of critical information about her arrest but provided no documents or videos to her. In particular, the OPA investigator provided the name of Defendant Aldrich, which Mrs. Polk and her representatives had previously been unable to obtain. The investigator also informed Mrs. Polk that Aldrich had drafted a warrant affidavit to attempt to have Mrs. Polk charged with felon in possession of a firearm, and that Aldrich would have had access to Metro's CJIS system while drafting that affidavit such that he would have been able to see the misdemeanor outcome of the 1999 case. The OPA investigator also informed Mrs. Polk that Aldrich's draft warrant affidavit acknowledged that Mrs. Polk had shown him her Tennessee handgun carry permit before he had arrested her. The OPA investigator also informed Mrs. Polk that MNPD definitely had body camera footage from her arrest.

80. At this time, as far as Mrs. Polk is aware MNPD has not sustained any policy violation charges or imposed any discipline on Officer Aldrich for having falsely arrested her.

81. To date, notwithstanding the extensive efforts and expenditure of money by both Mrs. Polk and her legal representatives, MNPD has not produced a single record to Mrs. Polk or her representatives relevant to her August 11, 2023 arrest.

## CLAIMS FOR RELIEF

### COUNT I: FALSE ARREST IN VIOLATION OF THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION
### (42 U.S.C § 1983)

### (ALL DEFENDANTS)

82. Plaintiff hereby reincorporates paragraphs 1 – 81 by reference.

83. On August 11, 2023, Defendant Aldrich arrested Mrs. Polk without having probable cause to believe that she had committed a crime.

84. Aldrich took Mrs. Polk's liberty from her, and delivered her to jail for several hours until a night court commissioner ordered her released.

85. Defendant Aldrich acted under color of state law in arresting Mrs. Polk.

86. If Aldrich had not willfully disregarded the valid Tennessee handgun carry permit that Mrs. Polk showed him, he would have recognized that he was mistaken in asserting that she was a felon.

87. Defendant Metro is responsible for the arrest because of its systemic policy and training failures, especially with regard to the issues of:

    a. The requirement that Metro train MNPD officers on the constitutional requirement that officers consider exculpatory evidence in determining whether or not they have probable cause to arrest a suspect;

b. Metro's systemic failure to discipline MNPD officers for arresting innocent people without probable cause.

88. Defendant Aldrich acted in blatant disregard for Mrs. Polk's constitutional rights, after she and her husband made every effort to provide him with the information needed to estlabish her innocence.

89. Defendants' illegal arrest caused Mrs. Polk to suffer a deprivation of liberty as well as emotional harm.

### REQUEST FOR RELIEF

**WHEREFORE**, these premises considered, Plaintiffs pray:

1. That the Defendants Answer this Complaint within the time provided by law.
2. That this cause be tried by a jury.
3. That judgment for Plaintiff enter against the Defendants on each count.
4. That Plaintiff be awarded nominal, compensatory, and punitive damages against Defendants.
5. That Plaintiff be awarded attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).
6. That the court costs in this matter be taxed to Defendants.
7. That Plaintiff be awarded all other relief to which it may appear she is entitled in the interests of justice.

Respectfully submitted,

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953
Relentless Advocacy, PLLC
7000 Executive Center Drive, Suite 240
Brentwood, TN 37027
T: (615) 891-3901 / F: (615) 229-6387
E: Kyle@relentlesslaw.com